UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
R.A.R.R.,

                        Petitioner,

             - against -

JUDITH ALMODOVAR, *et al.*,

                        Respondents.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-6597 (PKC)

PAMELA K. CHEN, United States District Judge:

      Petitioner R.A.R.R. ("Petitioner") filed this Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2241 ("Section 2241") on November 26, 2025, seeking immediate release from the custody of Immigration and Customs Enforcement ("ICE"). (Pet., Dkt. 1.) Petitioner names as Respondents Judith Almodovar, in her official capacity as the Acting Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security ("DHS"); Todd Lyons, in his official capacity as the Acting Director of ICE; Kristi Noem, in her official capacity as the Secretary of Homeland Security within DHS; Pamela Bondi, in her official capacity as Attorney General of the United States; Sirce E. Owen, in her official capacity as Acting Director of the Executive Office for Immigration Review; and Raul Maldonado Jr., in his official capacity as the Warden of the Metropolitan Detention Center ("MDC"), where Petitioner was detained at the time he filed his Petition (collectively, "Respondents"). (*Id.* ¶¶ 12–17.) The Court held oral argument on the Petition on December 19, 2025, during which it granted the Petition and ordered Petitioner's immediate release, indicating that "a written Memorandum & Order [would] follow" to "more fully explain[]" its reasoning. (12/19/2025 Dkt. Order.)

# BACKGROUND

I. **Factual Background**

   A. **Petitioner's Arrival in the United States**

Petitioner is a 19-year-old immigrant from El Salvador. (Pet., Dkt. 1, ¶ 1.) Growing up in El Salvador, Petitioner faced a number of hardships, including "abandonment by his father, rural poverty, and water insecurity." (*Id.* ¶ 18 (citing Muñoz Decl., Dkt. 1-1, ¶ 4).) These circumstances "inspired him to engage in human rights and environmental activism to support his community," (*id.* (citing same)), including working with "a human rights group that advocated for environmental justice, access to water, labor rights, and health care access," (Muñoz Decl., Dkt. 1-1, ¶ 4). The group "held public protests and meetings and submitted a petition to the mayor of a town." (*Id.*) The leader of the group, whom Petitioner considered a "mentor and positive male role model," died in 2021, after which Petitioner "assumed [a] leadership[] role[] within the group." (Psych. Eval., Dkt. 1-7, at 2.) The Salvadoran government, under President Nayib Bukele, "demonstrated that they did not like the efforts of [Petitioner's] human rights group and would surveil the group and intimidate them." (Muñoz Decl., Dkt. 1-1, ¶ 4.) Eventually, "fearful of government reprisals," Petitioner decided to seek asylum in the United States. (Psych. Eval., Dkt. 1-7, at 2.)

In January 2024, at the age of 17, Petitioner entered the United States. (Pet., Dkt. 1, ¶¶ 1–2.) After crossing the physical border into the United States, Petitioner was detained by Customs and Border Protection ("CBP") and designated an unaccompanied alien child ("UAC"). (*Id.*; *see* Reply in Opp'n ("Opp'n"), Dkt. 11, at 1 (representing that Petitioner was "encountered near Brownsville, Texas" after entering "surreptitiously" and then screened as a UAC by CBP).) Due to his status as a UAC, he was transferred to the custody of the Office of Refugee Resettlement ("ORR"), which placed Petitioner in a children's shelter. (Pet., Dkt. 1, ¶ 2; *see* Opp'n, Dkt. 11, at 13 (referring to the shelter as a "secure facility").) In February 2024, after determining that

Petitioner was neither a danger to the community nor a flight risk, ORR released Petitioner to an ORR-approved sponsor,[1] R.A.R.R.'s cousin in Texas. (Pet., Dkt. 1, ¶¶ 2, 20.) As part of this release, ORR provided Petitioner with a "release form" indicating his UAC status.[2] (*Id.* ¶ 20.) In April 2024, Petitioner moved to Long Island, New York, to reunite with his mother's partner, whom Petitioner considers a stepfather. (*Id.*; R.A.R.R. Decl., Dkt. 1-2, ¶ 3.) Since his move to Long Island, Petitioner had "been taking classes to obtain his high school equivalency degree and working cleaning offices." (Pet., Dkt. 1, ¶ 21 (citing R.A.R.R. Decl., Dkt. 1-2, ¶ 4).) He has no criminal record in the United States or El Salvador. (*Id.* (citing Muñoz Decl., Dkt. 1-1, ¶ 8).)

B. **Petitioner's Re-Detention by ICE**

On August 26, 2025, while Petitioner was en route to work with his co-worker, they were pulled over by ICE agents on Long Island at around 6:00 a.m. (R.A.R.R. Decl., Dkt. 1-2, ¶¶ 5–6; Rey Decl., Dkt. 11-1, ¶ 12.) Petitioner provided ICE with his ORR release paperwork, but ICE concluded that he had "no legal status in the United States" and detained him. (Rey Decl., Dkt. 11-1, ¶ 12; R.A.R.R. Decl., Dkt. 1-2, ¶¶ 7–9; Pet., Dkt. 1, ¶¶ 22–24.)

ICE agents brought Petitioner to an ICE office, where he was "chained at the hands and feet" and locked in a small room with twelve other people, "one on top of the other." (R.A.R.R. Decl., Dkt. 1-2, ¶ 9.) He was then transported to 26 Federal Plaza in New York, where he was detained for around two days. (*Id.*) There, he was made to sleep on the floor with "many other

---

[1] Petitioner was released to his sponsor in accordance with 45 C.F.R. § 410.1200, which details ORR's review and approval of sponsors. (*See* Opp'n, Dkt. 11, at 10 ("ORR releases a UAC to [a] 'vetted and approved' sponsor" (citing 45 C.F.R. § 410.1200)).)

[2] Petitioner's "Verification of Release" form confirms Petitioner was released pursuant to Section 462 of the Homeland Security Act of 2022, 6 U.S.C. § 279, and Section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232. (Verification of Release, Dkt. 1-3.)

3

people," and given only pasta and water to eat "for breakfast, lunch, and dinner." (*Id.*) Petitioner was then transferred to the MDC. (Pet., Dkt. 1, ¶ 23 (citing Muñoz Decl., Dkt. 1-1, ¶ 8).) Petitioner states that "[i]t has not been easy to get used to life in jail." (R.A.R.R. Decl., Dkt. 1-2, ¶ 10.) He reports experiencing panic symptoms, nightmares, and difficulty sleeping. (*Id.*; Psych. Eval., Dkt. 1-7, at 5.) His detention separates him from his family and prevents him from attending school. (R.A.R.R. Decl., Dkt. 1-2, ¶ 11.)

II.     **Procedural Background**

Petitioner's immigration proceedings are ongoing.[3] (*See* Rey Decl., Dkt. 11-1, ¶¶ 15–28.) As relevant here, on October 7, 2025, Petitioner filed a motion for custody redetermination in immigration court through his immigration counsel. (Pet., Dkt. 1, ¶ 25.) The Immigration Judge ("IJ") denied the motion based on the IJ's purported lack of jurisdiction under the recent Board of Immigration Appeals ("BIA") decision *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025) (per curiam). (*Id.*) In that case, the BIA held that IJs "lack authority to hear bond requests or to grant bond to aliens who are present in the United States without admission."[4] 29 I&N at 216.

---

[3] The Court's jurisdiction over this matter is limited to Petitioner's constitutional challenges to his detention, and the Court has no jurisdiction over the underlying removal proceedings. *See L.G.M. v. LaRocco*, 788 F. Supp. 3d 401, 404 (E.D.N.Y. 2025) (first citing *Ozturk v. Hyde*, 136 F.4th 382, 399–400 (2d Cir. 2025) (finding petitioner's First and Fifth Amendment challenges to her detention distinct from challenges to her removal proceedings and therefore properly within the district court's jurisdiction) (collecting cases); and then citing *Mahdawi v. Trump*, 136 F.4th 443, 452 (2d Cir. 2025) (same)). Accordingly, the Court recites only the facts related to Petitioner's bond and custody determinations, as well as those details regarding Petitioner's removal proceedings, that are necessary for consideration of his Petition.

[4] The BIA's decision in *Matter of Yajure Hurtado* is binding on IJs, but not on Article III courts. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("[I]t is the province of the courts—not the agency—to authoritatively interpret the statute." (internal quotation marks omitted)). The courts have overwhelmingly disagreed with the BIA's statutory construction in *Matter of Yajure Hurtado*, as discussed further below. This Court similarly finds *Matter of Yajure Hurtado* to be entirely unpersuasive and thus gives it no deference.

The IJ in Petitioner's case did not reach the question of whether Petitioner was a flight risk or a danger to the community. (Pet., Dkt. 1, ¶ 25 (citing IJ Bond Denial, Dkt. 1-6).)

The next day, on October 8, 2025, Petitioner filed another motion through counsel for a custody redetermination or, in the alternative, a hearing pursuant to *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999). (Pet., Dkt. 1, ¶ 26 (citing Muñoz Decl., Dkt. 1-1, ¶ 14).) As Petitioner explains, "*Joseph* hearings are a mechanism to challenge whether a noncitizen is properly subject to mandatory detention without a bond hearing." (*Id.*) Petitioner argued that the IJ had jurisdiction to hold a bond hearing pursuant to the TVPRA, given Petitioner's designation as a UAC. (*Id.* (citing Muñoz Decl., Dkt. 1-1, ¶ 14; 8 U.S.C. § 1232(c)(2)(B)).) On October 15, 2025, the IJ held a hearing on the motion and stated that he intended to deny the request. (*Id.* (citing Muñoz Decl., Dkt. 1-1, ¶ 14).) With the IJ's permission, Petitioner withdrew the request and refiled it on November 12, 2025, again "highlight[ing] why [Petitioner] was not subject to no-bond detention . . . and instead should receive the protections mandated by the [TVPRA]." (*Id.* (citing same).) At the time Petitioner filed the instant action, he had not yet received a response. (*Id.* (citing same).)

Petitioner filed this Petition on November 26, 2025. (*See generally id.*) In addition to seeking "a Writ of Habeas Corpus ordering Respondents to immediately release [Petitioner] from custody," Petitioner seeks declaratory relief for Respondents' alleged violations of the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706; the Immigration and Nationality Act ("INA") and TVPRA, 8 U.S.C. §§ 1226(a) and 1232(c)(2)(B); and the Suspension Clause of Article I of the United States Constitution. (*Id.* at 25.)

5

Respondents filed their opposition on December 11, 2025. (*See* Opp'n, Dkt. 11.) Petitioner replied on December 17, 2025, (Pet. Reply, Dkt. 14), at which point the Petition was fully briefed. The Court held a hearing on the Petition on December 19, 2025. (*See* 12/19/2025 Dkt. Order.) At the hearing, the Court granted the Petition from the bench, ordered Petitioner's immediate release from custody, and stated that a written Memorandum & Order more fully explaining its reasoning would follow. (*Id.*)

## LEGAL STANDARD

Section 2241 confers jurisdiction on federal district courts to hear habeas cases. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (explaining that Section 2241 "authorize[s] any person to claim in federal court that he or she is being held 'in custody in violation of the Constitution or laws . . . of the United States'" (quoting 28 U.S.C. § 2241(c)(3))); *see also Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978) ("[A] district court has inherent power to enter an order affecting the custody of a habeas petitioner who is properly before it contesting the legality of his custody."). This "inherent power . . . extends to admitting petitioners to bail in the immigration habeas context." *L.G.M.*, 788 F. Supp. 3d at 404 (quoting *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (itself citing *Mapp v. Reno*, 241 F.3d 221, 227 (2d Cir. 2001) (internal quotations omitted))). A petitioner under Section 2241 "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (citing *Parke v. Raley*, 506 U.S. 20, 31 (1992); *Walker v. Johnston*, 312 U.S. 275, 286 (1941)).

## DISCUSSION

The Petition raises two core issues. The first is whether Petitioner's detention was authorized by 8 U.S.C. § 1225(b)(2)(A) ("Section 1225(b)"), as Respondents argue, or 8 U.S.C.

§ 1226(a) ("Section 1226(a)"), as Petitioner argues. The second issue is whether the TVPRA entitled Petitioner to additional protections based on his designation as an unaccompanied minor or UAC, even though he is now older than 18.

I.  **Petitioner's Section 1226(a) Arguments**

Petitioner alleges procedural and substantive violations of his due process rights because his detention was only authorized by Section 1226(a), which entitles him to an individualized custody determination that he did not receive. (*See* Pet., Dkt. 1, ¶¶ 56–67.) Respondents argue that Petitioner's detention is authorized not by Section 1226(a) but rather by Section 1225(b), which requires mandatory detention while the noncitizen's removal proceedings are pending (absent exceptions inapplicable here). (*See* Pet. Opp'n, Dkt. 11, at 7.) The briefing on this issue from both sides is extensive.

The overwhelming majority of courts in this District and across the country have found that noncitizens like Petitioner—who were detained by ICE after living in the United States for years—were "already in the country" and therefore could only be detained pursuant to Section 1226(a). *See, e.g.*, *Ye v. Maldonado, et al.*, No. 25-CV-6417 (AMD), 2025 WL 3521298, at *3–6 (E.D.N.Y. Dec. 8, 2025) (holding that petitioner who had been re-arrested by ICE after an illegal entry into the country years earlier was detained under Section 1226(a) rather than Section 1225(b)); *Rodriguez-Acurio v. Almodovar*, No. 2:25-CV-6065 (NJC), --- F. Supp. 3d ----, 2025 WL 3314420, at *12–25 (E.D.N.Y. Nov. 28, 2025) (same); *O.F.B. v. Maldonado*, No. 25-CV-6336 (HG), --- F. Supp. 3d ----, 2025 WL 3277677, at *4–5 (E.D.N.Y. Nov. 25, 2025) (same); *Sarmiento Guerrero v. Noem*, No. 25-CV-5881 (EK), 2025 WL 3214787, at *3–6 (E.D.N.Y. Nov. 18, 2025) (same); *Hyppolite v. Noem*, No. 25-CV-4304 (NRM), 2025 WL 2829511, at *7–12 (E.D.N.Y. Oct. 6, 2025) (same); *Artiga v. Genalo*, No. 25-CV-5208 (OEM), 2025 WL 2829434, at *4–8 (E.D.N.Y. Oct. 5, 2025) (same); *J.U. v. Maldonado*,

7

No. 25-CV-4836 (OEM), --- F. Supp. 3d ----, 2025 WL 2772765, at *4–9 (E.D.N.Y. Sep. 29, 2025) (same).

Although Petitioner entered the United States as a UAC, he, like the petitioners in the above-cited cases, was released pursuant to Section 462 of the Homeland Security Act of 2022, and is thus similarly situated to these petitioners for purposes of the Section 1225/Section 1226 and procedural due process analysis. (*See* Rey Decl., Dkt. 11-1, ¶ 4.) The Court agrees with the reasoning of these decisions and finds it wholly applicable to the instant matter. The Court finds no reason—and Respondents have provided none—to rule contrary to "over 160 different judges sitting in about fifty different courts spread across the United States." *Barco Mercado v. Francis*, No. 25-CV-6582 (LAK), 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025). It thus holds that ICE's August 26, 2025 detention of Petitioner was only authorized pursuant to Section 1226(a).

Having determined that Petitioner was detained subject to Section 1226(a) and entitled to a custody determination, the next question is whether his detention under that statute was lawful. Courts in the Second Circuit apply *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine the whether the process afforded in civil immigration detention is constitutionally adequate. *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). The *Mathews* test requires the Court to balance: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (quoting *Mathews*, 424 U.S. at 335). While Petitioner must show, by a preponderance of the evidence, that his detention overall is unlawful in order to be granted *habeas* relief, once a custodial determination is required, it is Respondents who "bear

8

the burden of proving the need for continued detention." *Black v. Decker*, 103 F.4th 133, 155 (2d Cir. 2024).

Petitioner's private interest is "the most significant liberty interest there is—the interest in being free from imprisonment." *Id.* (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). The risk that Petitioner's liberty was erroneously deprived under the process afforded to him is unacceptably high. *See Lopez Benitez*, 795 F. Supp. 3d at 494–95 (noting that "[a]t a minimum, . . . [Section] 1226(a) requires a valid exercise of DHS's discretion," and that when DHS's sole explanation for a petitioner's detention is that the detention was mandatory, that "is precisely the opposite of an exercise of discretion"). Finally, any government interest in Petitioner's ongoing detention is low, particularly as Respondents have provided no legal or factual argument to displace or alter ORR's prior determination that Petitioner presents neither a danger to the community nor a flight risk. *See Valdez v. Joyce*, No. 25-CV-4627, 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025) (noting "ensuring the appearance of aliens at future immigration proceedings' and 'preventing danger to the community'" as valid government interests (quoting *Zadvydas*, 533 U.S. at 690)). If anything, Petitioner's conduct since his release from Health and Human Services ("HHS")/ORR custody in February 2025—e.g., attending school, working, and not committing any crimes—only reinforces ORR's initial determination that Petitioner presents neither a risk of flight nor any danger to his community.

Accordingly, the Court holds that Respondents' "detention of Petitioner with no process at all, much less prior notice, no showing of changed circumstances, or an opportunity to respond, violate[d] his [procedural] due process rights."[5] *Ye*, 2025 WL 3521298, at *8 (citations omitted).

---

[5] As previously noted, Petitioner alleges that his detention violates both his procedural and substantive due process rights. (*See* Pet., Dkt. 1.) Having found Petitioner releasable on

The Court also finds that Respondents' failure to provide Petitioner with a bond hearing upon his request, as provided for by Section 1226(a) and its implementing regulations, violated the INA. *See id.* at \*9; *O.F.B.*, 2025 WL 3277677, at \*8. Petitioner has met his burden of showing, by the preponderance of the evidence, that his detention has been unlawful.

## II.     Petitioner's TVPRA Claims

While the unlawful nature of Petitioner's detention under Section 1226(a) alone warrants his release, Petitioner also argues that he was entitled to additional protections under the TVPRA because he entered the United States as an unaccompanied minor. (*See* Pet., Dkt. 1, ¶ 55.) Respondents contend that Petitioner is no longer a minor and thus no different from any other adult noncitizen. (*See* Opp'n, Dkt. 11, at 3 ("No part of the statutory scheme established by Congress suggests that DHS must in perpetuity treat former-UACs differently from other adult aliens.").) Since few courts have had the occasion to consider whether the TVPRA applies in these circumstances and the effect, if any, on a petitioner's *habeas* claims, the Court also and separately assesses whether Petitioner should be released based on the TVPRA.

The TVPRA governs the detention of unaccompanied minors. *See generally* 8 U.S.C. § 1232 ("Section 1232"); *see also Lopez v. Sessions*, No. 18-CV-4189 (RWS), 2018 WL 2932726, at \*5 (S.D.N.Y. June 12, 2018) (discussing Section 1232); *see also Garcia Ramirez v. ICE*, --- F. Supp. 3d ----, No. 18-CV-0508 (RC), 2025 WL 3563183, at \*1–2 (D.D.C. Dec. 12, 2025) (discussing legal framework around Section 1232). It provides, in relevant part, that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of [HHS]," 8 U.S.C. § 1232(b)(1); that "an

---

procedural due process grounds alone, the Court declines to analyze Petitioner's substantive due process claim.

unaccompanied alien child in the custody of the Secretary of [HHS] shall be promptly placed in the least restrictive setting that is in the best interest of the child," taking into consideration "danger to self, danger to the community, and risk of flight," *id.* § 1232(c)(2)(A)[6]; and that "if a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight," *id.* § 1232(c)(2)(B). ORR is the specific office within HHS that is tasked with caring for UACs under the applicable statutes and regulations. *See supra* n.1.

There is no dispute that Petitioner was entitled to the protections of the TVPRA when CBP first encountered him in the United States. (*See* Pet., Dkt. 1, ¶ 19 (discussing Petitioner's transfer to ORR custody and subsequent placement in a children's shelter); Opp'n, Dkt. 11, at 11–13 (noting that CBP deemed Petitioner to be a UAC after he crossed the border and transferred him to ORR custody, consistent with the TVPRA).) The question is whether the TVPRA still applies now that Petitioner is 19, having turned 18 while living with his mother's partner. Petitioner contends that he never ceased being under ORR custody and that his re-detention in August 2025 was the transfer to DHS custody that triggered the DHS's obligation under Section 1232(c)(2)(B) to consider placing him in the "least restrictive [custodial] setting" available. (Pet. Reply, Dkt. 14, at 3, 12.) Respondents counter that Petitioner's release to a sponsor (Petitioner's cousin) when Petitioner was 17 removed him from ORR custody, such that no "transfer" from ORR to DHS occurred when Petitioner turned 18 and, correspondingly, that Section 1232(c)(2)(B) was never triggered. (Opp'n, Dkt. 11, at 3, 11.)

---

[6] In this regard, the procedures established for UACs parallels the Section 1226(a) procedures that apply to adults who enter the United States and are released, sometimes on their own recognizance, pending their immigration proceedings.

### A. Custodial Continuum

As previously discussed, and as both parties concede, Petitioner was transferred into ORR custody very shortly after CBP encountered him in the United States in January 2024. (Pet., Dkt. 1, ¶ 19; Opp'n, Dkt. 11, at 11.) ORR then placed him in a children's shelter. (Pet., Dkt. 1, ¶ 2.) ORR later released Petitioner to a family member "verified" by ORR and pursuant to a "Sponsor Care Agreement." (Verification of Release, Dkt. 1-3; Pet., Dkt. 1, ¶ 20; Opp'n, Dkt. 11, at 13.) Finally, Petitioner moved to Long Island "with the permission of his sponsor." (Pet., Dkt. 1, ¶ 20.) It was while Petitioner was living in Long Island and, Petitioner argues, under the Sponsor Care Agreement that ICE re-detained him. (*See* Pet. Reply, Dkt. 14, at 12 (stating that Petitioner was living under ORR custody "while on release during the Sponsor[] Agreement" (citation omitted)).) But according to Respondents, "Petitioner had not been in the custody of ORR since February 25, 2024[,]" when Petitioner was allowed to live with his cousin under the Sponsor Care Agreement. (Opp'n, Dkt. 11, at 13.)

The Court rejects Respondents' argument and finds that Petitioner remained in HHS/ORR custody from the time he was placed with his cousin in Texas until he was re-detained by ICE while living with his mother's partner in Long Island. This is consistent with the holdings in *Lopez*, 2018 WL 2932726, and *Garcia Ramirez*, 2025 WL 3563183, both of which the Court finds persuasive and on point. As the court explained in *Lopez*, "'custody' need not be limited to a jail cell." *Lopez*, 2018 WL 2932726, at *2 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 350 (2004) (Kennedy, J., dissenting)). ORR retains "responsibility" for "the care and custody of *all* unaccompanied alien children" (subject to threshold exclusions inapplicable here), regardless of their physical placement. 8 U.S.C. § 1232(b)(1) (emphasis added). "ORR makes all placement decisions involving UACs to ensure they are not released on their own recognizance." *Lopez*, 2018 WL 2932726, at *6 (citing 6 U.S.C. § 279(b)(1)(C), (D), (b)(2)). Between 2021 and 2024,

12

an average of over 100,000 UACs per year were released to sponsors. *Released to Sponsors*, ORR: Unaccompanied Alien Children Data (Dec. 22, 2025), https://acf.gov/orr/about/ucs/facts-and-data. In 2024, 82.1% of these released UACs were referred for post-release services provided by ORR. *Id.* And indeed, as mandated by the relevant government regulations, ORR offers these post-release services for certain UACs no longer in its physical custody, including everything from facilitating attendance at immigration proceedings to assistance with school enrollment, access to medical insurance, and counseling. 45 C.F.R. § 410.1210(b).

Respondents attempt to distinguish *Lopez*, arguing that the petitioner in *Lopez* aged out while he was still in ORR custody, whereas Petitioner turned 18 while living with his mother's partner and was thus, Respondents maintain, no longer in ORR's custody. But the distinction that Respondents would have the Court draw would breed perverse results: UACs who are still in physical ORR custody when they turn 18 because they present a risk of flight or danger that precludes their release would get the legal protections of Section 1232(c)(2)(B), i.e., "placement in the least restrictive setting available" after being transferred to DHS custody, but the UACs who **were** released from physical ORR custody before the age of 18 because they present little or no risk of flight or danger would not. This reading of Section 1232(c)(2)(B) is plainly contrary to the relevant statutes and the clear purpose of Section 1232 to provide enhanced protections for UACs. *See Lopez*, 2018 WL 2932726, at *9 ("For Section 1232(c)(2)(B) to protect only minors who attain majority while in the physical custody of [ORR], but not those over whom the [ORR] exercises custodial and legal control pursuant to sponsorship agreements, would run counter to the spirit and purpose of the [statute].").

The Court therefore finds that although ORR relinquished *physical* custody of Petitioner upon his release to his ORR-vetted and approved sponsor, ORR retained *legal* custody of Petitioner

13

throughout his sponsored release. Petitioner was thus in ORR legal custody up until the day he was re-detained by ICE, at which point Petitioner's custody was effectively transferred from ORR to ICE, which triggered the requirement under Section 1232(c)(2)(B) that ICE conduct an assessment of the "least restrictive [custodial] setting" for Petitioner. 8 U.S.C. § 1232(c)(2)(B); *see Lopez*, 2018 WL 2932726, at *9 ("The protections of Section 1232(c)(2)(B) therefore extend beyond those over whom the [ORR] exercises physical custody; they apply to UACs who turn eighteen while in the legal custody of the [ORR] and on release pursuant to sponsorship agreements."). By failing "to follow procedures mandated by Section 1232(c)(2)(B)," Respondents violated the TVPRA and the APA. *Garcia Ramirez*, 2025 WL 3563183, at *1.

### B. Temporal Limits to TVPRA Protection

Regardless of his custodial status, Respondents also argue that once Petitioner turned 18, he was no longer entitled to the protections of the TVPRA and Section 1232(c)(2)(B). According to Respondents, "[n]o part of the [TVPRA] suggests that DHS must in perpetuity treat former-UACs differently from other adult aliens." (Opp'n, Dkt. 11, at 3.) Petitioner counters that "the statute does not place any time limits on ICE's duties under the statute, either on the front end or the back end," and that "ICE is not relieved of its obligation to follow [Section 1232(c)(2)(B)] at the end of the day on the age-out's eighteenth birthday." (Pet. Reply, Dkt. 14, at 11–12 (quoting *Garcia Ramirez*, 2025 WL 3563183, at *29).)

The Court agrees with *Lopez* and *Garcia Ramirez* that the removal of TVPRA protections on the day a UAC turns 18 appears to run directly counter to the statute, which imposes duties on ICE *starting* on that very day. 8 U.S.C. § 1232(c)(2)(B) (requiring a consideration of "least restrictive setting[s]" *once* the UAC "reaches 18 years of age" (emphasis added)); s*ee Lopez*, 2018 WL 2932726, at *13 ("If UACs become 'arriving aliens' on the day they turn eighteen, subjecting them to rearrest and near-indefinite detention, then [Section 1232(c)(2)(B)] of the TVPRA would

14

lose the force of law."); *Garcia Ramirez*, 2025 WL 3563183, at *16 ("ICE cannot re-arrest and detain without affording age-outs the protection due under Section 1232(c)(2)(B) merely because some short time has passed since that protection was afforded." (citation omitted)). Indeed, as the court in *Garcia Ramirez* explained, allowing Respondents to thwart Congress's intent "by complying with Section 1232(c)(2)(B) one day—considering an age-out for placement in the least restrictive setting . . . —only to claw back that consideration the next day (despite no material change in the age-out's circumstances)" would deprive the age-out of "the consideration they were owed under the statute." *Garcia Ramirez*, 2025 WL 3563183, at *16. The Court agrees that this would be "untenable." *Id.*

Contrary to Respondents' assertion, this is not a grant of protection "in perpetuity." (Opp'n, Dkt. 11, at 3.) It is a grant of protection for as long as the circumstances warranting the UAC's original release to a sponsor remain unchanged. *See Lopez*, 2018 WL 2932726, at *12 (noting that the government had failed to show any change in circumstances since it had determined UAC's release to his mother was "appropriate"); *Garcia Ramirez*, 2025 WL 3563183, at *7 (agreeing that "Defendants' practice of re-arresting and detaining age-outs after their initial release—without any material change in circumstances— . . . violates Section 1232(c)(2)(B)"); *cf. Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017) (quoting the government's representation that "DHS generally only re-arrests an alien pursuant to § 1226(b) after a material change in circumstances"), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Respondents' case law only reinforces this. In *Mendez Ramirez v. Decker*, the court concluded that petitioner had lost his UAC status because he had been released to the custody of a parent and thus no longer met the statute's definition of "*unaccompanied* alien child." 612 F. Supp. 3d 200, 210–11 (S.D.N.Y. 2020) (emphasis added). In *Jose L.P. v. Whitaker*, the court also

concluded that the petitioner had lost his UAC status due to release to a parent; ICE later detained him because he was suspected of gang activity. 431 F. Supp. 3d 540, 549–50 (D.N.J. 2019).[7]

Here, Respondents have made no showing of changed circumstances, and their basis for detaining Petitioner now is merely his alleged "removability." (*See generally* Opp'n, Dkt. 11.) Absent a showing that the deprivation of Petitioner's liberty is warranted due to danger to the community or risk of flight—i.e., circumstances materially different from those that supported Petitioner's prior release into the community to live with his sponsor—Petitioner's re-detention violated his procedural due process rights. *See Lopez*, 2018 WL 2932726, at *11 (discussing procedural due process considerations given, *inter alia*, *Zadvydas*, 533 U.S. at 690, and *Mathews*, 424 U.S. at 335).

## CONCLUSION

Accordingly, Petitioner's detention without an individualized custody determination violated the Due Process Clause of the Fifth Amendment, the INA, and the APA, and his Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241, (Pet., Dkt. 1), is GRANTED. The Court reiterates that Petitioner's detention is unlawful under both Section 1226 and Section 1232.

While Respondents have already effectuated Petitioner's release from ICE custody, (*see* Dkt. 16), the Court reminds Respondents that "Petitioner must not be re-detained by Respondents without notice and an opportunity to be heard at a pre-deprivation bond hearing before a neutral decisionmaker, at which Respondents will have the burden of showing that Petitioner's re-detention is authorized under 8 U.S.C. §§ 1226(a) and 1232(c)(2)(B)." (12/19/2025 Dkt. Order.)

---

[7] The court in *Mendez Ramirez* took issue with the *Lopez* court's analysis, or lack thereof, of the impact of Lopez's release to a parent. *See Mendez Ramirez*, 612 F. Supp. 3d at 212 (arguing that the *Lopez* court had failed to consider the statutory impact of Lopez's release to his parent). This is not an issue in this case because Petitioner was not released to a parent.

16

The Clerk of Court is respectfully directed to enter judgment consistent with this Memorandum & Order and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 6, 2026
      Brooklyn, New York